IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | CASE NO. 2:10-CR-17-WKW[WO] |
| ) | |
| JAMAL GARROTT and ) | |
| TOSHA EASTERLY GARROTT, ) | |
| ) | |
| Defendants. ) | |
| ) | |

**MEMORANDUM OPINION AND ORDER**

On February 24, 2010, Defendants Jamal Garrott and Tosha Easterly Garrott[1] were charged in a two-count indictment with possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 2, and with manufacturing marijuana plants, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.  (Doc. # 1.)  This cause is before the court on Defendants' motions to suppress evidence obtained as a result of a warrantless search of their property.  (Docs. # 27, 29.)  The Magistrate Judge conducted a hearing on the motions (*see* Docs. # 35, 36) and filed a Report and Recommendation on July 6, 2010 (Doc. # 47), recommending that the motions be granted in part and denied in part.  Defendants object to the partial denial of their motions.  (Docs. # 51, 52.)

Pursuant to 28 U.S.C. § 636(b)(1), the court conducts a *de novo* review of the portions of the Recommendation to which the objections were made and finds that the objections are due to be sustained and that the motions to suppress are due to be granted.

---

[1] Jamal Garrott and Tosha Easterly Garrott are husband and wife.

## I. BACKGROUND[2]

On August 10, 2010, while on routine patrol in Montgomery County, Deputies Gregory Thompson and Archie Maggard received calls from an undisclosed source that "there were some marijuana plants behind th[e] house" located at Defendants' address. Upon arrival at the scene, the deputies parked their vehicles on the street and proceeded down Defendants' driveway and to the front door. Defendants' front yard was enclosed by a chain link fence, but no gate obstructed the driveway, and no "No Trespassing" signs, or the like, were present on the property. A security camera, mounted on the front of the house directly above the front door, was plainly visible.

When no one answered the front door, the deputies went around the left side of the house, stepped off the paved driveway, and walked through the cut grass to the rear of Defendants' backyard. The deputies testified that they intended to walk through Defendants' property to the rear to inspect an open field behind the property for the presence of marijuana plants. There is no evidence that the field belonged to Defendants.

They walked about twenty to twenty-five yards, beyond two old vehicles parked on the grass. Viewing no marijuana in the field beyond a partially constructed wooden fence on or near the property line, the deputies turned around and saw four marijuana plants growing in three pots and one bucket behind one of the vehicles, an old Cadillac. The plants were partially obstructed from view by a plywood board leaning against the vehicle and

---

[2] The following facts derive from the transcript of the hearing on the motions and the exhibits submitted during the hearing. (*See* Docs. # 35, 36.)

could not be seen from the public road in front of the house. The plants could be seen, however, from the backyards of the adjoining properties and from the field behind Defendants' lot.

Defendants' entire backyard was enclosed by a partially constructed wooden fence, consisting of vertical posts and two-by-four cross rails (one cross rail near the ground, and one approximately five feet off the ground). The fence had yet to be filled in with vertical rails, or "pickets," and thus did not obstruct the view of the yard. Beyond the rear fence (which was about twenty-five to thirty yards from the house) lay the open field with tall grass and trees. Neighboring residential lots abutted the sides of Defendants' property.

From the photographs submitted by the Government during the hearing, it appears that a lawn covered the entire backyard and, based on the length of the grass, had been mowed recently. It is also apparent from the testimony and the photographs of the property that the backyard was approximately one-eighth acre in size.[3] Abutting the outer rear wall of the house at the time of the search was a bag of potting soil, a clay pot, a trash can, a blue chair, a red solo cup, and a barbecue grill. The lawn itself was empty except for the two cars, the plywood board, the plants, a lawn hose that stretched from the house to the plants, and a shed located to the side of the vehicles. There were no other buildings, fences, or structures

---

[3] One acre is 4,840 square yards. Even assuming (based on the deputies' testimony that the marijuana plants were found approximately twenty yards from the house and several yards from the back fence) that the length of the backyard was thirty yards and that the width of the yard (based on the photographs) was twenty yards, the total size of the backyard would be 600 square yards.

between the back of the house and the location where the cars and plants were found – just twenty yards of mowed lawn.

After the deputies made a second unsuccessful attempt to contact someone in the house, they contacted their supervisor. Shortly thereafter, Investigator Dennis Smithee arrived at the scene. He testified that he "had overheard a call on the radio from dispatch . . . that possibly some marijuana plants were being grown in a backyard behind [Defendants'] address." (Hr'g Tr. 45 (Doc. # 36).) Investigator Smithee proceeded to the back of the house, walked through the yard, viewed the marijuana plants, and then walked back through the yard and knocked on the back door. At that time he noticed remnants of potting soil in the red Solo cup, located on the blue chair near the back door of the house. When no one answered the door, Investigator Smithee secured the scene until a warrant to search the house could be obtained.

After obtaining the warrant, the officers searched the residence and seized marijuana seeds, marijuana paraphernalia, and several firearms. The Government concedes that the marijuana plants served as the basis for the warrant to search the house, and that if the discovery of the plants was illegal, than the fruits of the search are due to be suppressed. (*See* Hr'g Tr. 66 (Doc. # 36) ("[T]he defendant is correct . . . . [W]ithout the . . . plants, there's no warrant. And without a warrant, I don't think we can claim [in] good faith that there [has not] been a constitutional violation to get the information that's in the warrant.").)

## II. DISCUSSION

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  The protections of the Fourth Amendment only extend to places where "the defendant can claim a 'reasonable expectation of privacy.'" *United States v. Berrong*, 712 F.2d 1370, 1373 (11th Cir. 1983) (quoting *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)).  "The Amendment does not protect the merely subjective expectation of privacy, but only those 'expectation[s] that society is prepared to recognize as "reasonable."'" *Oliver v. United States*, 466 U.S. 170, 177 (1984) (quoting *Katz*, 389 U.S. at 361).

The Supreme Court has distinguished the curtilage – the area immediately surrounding the home – from neighboring open fields, finding that the former, but not the latter, garners Fourth Amendment protection.  *Oliver*, 466 U.S. at 180 (citing *Hester v. Unites States*, 265 U.S. 57, 59 (1924)).  The curtilage surrounding one's home "is the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life,'" and, as such, warrants the same Fourth Amendment protections that attach to the home itself. *Id.* (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)).  On the other hand, an individual does not have a reasonable expectation of privacy in an open field – which "may include any unoccupied or undeveloped area outside the curtilage." *Id.* at 180 n.11.

The definition of the curtilage in any given case is a question of fact. *Berrong*, 712 F.2d at 1374.  The factors relevant to this determination include: (1) "the proximity of the area claimed to be curtilage to the home," (2) "whether the area is included within an

5

enclosure surrounding the home," (3) "the nature of the uses to which the area is put, and" (4) "the steps taken by the resident to protect the area from observation by people passing by." *United States v. Dunn*, 480 U.S. 294, 301 (1987). These factors are simply "useful analytical tools," and do not provide a "finely tuned formula that, when mechanically applied, yields a 'correct' answer to all extent-of-curtilage questions." *Id.* The ultimate inquiry is whether the defendant "'reasonably may expect that the area in question should be treated as the home itself.'" *United States v. Hatch*, 931 F.2d 1478, 1480 (11th Cir. 1991) (quoting *Dunn*, 480 U.S. at 300).

Upon a thorough review of *Dunn* and the Eleventh Circuit cases applying the *Dunn* factors in the suppression context, the court finds that the area where the marijuana plants were located was – contrary to the Magistrate Judge's finding – within the curtilage of Defendants' home.

1. **Proximity**

The Magistrate Judge concluded that the plants in this case were "not in close proximity" to the home because they were located twenty yards from the back of the residence and separated by a "wide strip of unoccupied grass" and two vehicles. (Doc. # 47, at 7.) Neither the Supreme Court nor the Eleventh Circuit has defined, in numerical distance terms, the phrase "close proximity." There is no magic distance (*e.g.*, 20, 50, or 100 yards) upon which curtilage is automatically transformed into an open field. *See United States v. Depew*, 8 F.3d 1424, 1427 (9th Cir. 1993) ("There is not . . . any fixed distance at which curtilage ends."). Because there is no bright line rule in this regard, comparing the facts of

this case to the facts of *Dunn*, and to the facts of Eleventh Circuit cases applying *Dunn* in the suppression context, is instructive.

In *Dunn*, the issue before the Supreme Court was "whether the area near a barn, located approximately 50 yards from a fence surrounding a ranch house, is, for Fourth Amendment purposes, within the curtilage of the house." 480 U.S. at 296. Finding that it was not, the Court articulated and applied the four factors discussed above. As to the proximity factor, the Court noted that the barn was sixty yards from the house and fifty yards from a fence surrounding the house. *Id.* at 302. This, the Court held, was a "substantial distance" and "support[ed] no inference that the barn should be treated as an adjunct of the house." *Id.*

In *Hatch*, the defendant moved to suppress marijuana seized from his property pursuant to a warrantless search. 931 F.2d at 1479-80. The Eleventh Circuit held that the marijuana was not within the curtilage of the home, noting that it was growing "thirty yards and farther" from the defendant's house and was separated from the defendant's house by "a taxidermy building, several fences, stock pens, a tac room, and a drying barn." *Id.* at 1481. Notably, the marijuana was planted outside the fences surrounding the house, "setting apart [the defendant's] house and taxidermy building as a separate compound . . . within the parcel of land." *Id.*

The Eleventh Circuit reached the same conclusion in *United States v. Taylor*. There, the defendant sought to suppress a knife, shotgun shells, and shotgun found in and around a pond on his property. 458 F.3d 1201, 1203-04 (11th Cir. 2006). The defendant's property

7

was approximately five aces in size. *Id.* at 1203. According to the court, the pond, which was approximately sixty yards from the house and separated by a barn and "other structures," was "substantially removed from the house." *Id.* at 1207. After applying the other factors, the court concluded that the pond was not within the curtilage of the defendant's home. *Id.* at 1208.

In *United States v. Nichols*, the defendant moved to suppress marijuana discovered during a helicopter search of his property. 248 Fed. App'x 105, 106 (11th Cir. 2007). In upholding the district court's denial of the defendant's motion to suppress, the Eleventh Circuit held that the area where the marijuana was growing was not within the curtilage of the defendant's home. *Id.* at 108. The marijuana plants were growing in a dirt spot more than 130 yards from the residence "and 'significantly' more than thirty feet beyond the large chicken house that represented the outermost point of the curtilage." *Id.* at 107. The marijuana was also separated from both the chicken house and the residence "by overgrown brush and broken-down machinery." *Id.*

All of the above cases are distinguishable from the instant case in two important respects. First, the distances between the relevant area and the defendant's house in each of the cases discussed above – 60 yards, 30 yards ("and farther"), 60 yards, and 130 yards, respectively – were greater than the twenty-yard distance in this case. Second, and more importantly, the relevant areas in those cases were set off from the houses by fences, buildings, and/or overgrown brush. Here, although there were, as the Magistrate Judge pointed out, two "old" cars between the house and the area where the marijuana was located,

8

the area in question was not set off by structures, buildings, fences, or vegetation. In *Nichols*, the court noted that the marijuana plants were separated from the house by broken down machinery. 248 Fed. App'x at 107. However, even assuming the cars located on Defendants' property in this case were "broken down" – a fact that is not supported by the record – the photographs of the yard do not indicate that the two cars formed a boundary between the first twenty yards of the backyard and the last five to ten yards of the backyard. In other words, the cars do not separate the curtilage from the open field. Notably, in *Nichols*, the marijuana plants were separated from the house not only by the broken down machinery, but by overgrown brush and a large chicken coop. *Id.* Here, the lawn was uniformly cut throughout the yard, and the shed was located to the side and rear of the cars and plants.

In sum, the court finds that the marijuana plants were growing in close proximity to Defendants' residence. *See United States v. Seidel*, 794 F. Supp. 1098, 1103 (N.D. Fla. 1992) (finding that marijuana plants growing "approximately sixty yards" from the defendant's home, where there were no internal boundaries or fences setting the plants apart from the house, were "in close proximity" to the house). This factor thus weighs strongly in favor of finding that the back portion of the backyard of a small, rural residential lot was within the curtilage of Defendants' home.

**2.    Enclosure**

The second *Dunn* factor also weighs somewhat in Defendants' favor. The boundaries of this small residential lot in a rural subdivision are obvious, as are those of the neighbors.

(*See* Aerial Photograph, Government Ex. 2.)  Moreover, Defendants' entire backyard was enclosed by a partially constructed wooden fence, consisting of vertical posts and top and bottom rails.  The house, the marijuana plants, and the area immediately behind the plants were within this enclosure.  Courts have emphasized that "[t]he fact that the yard and the house lie within the same fenced-off area is particularly significant." *United States v. Jenkins*, 124 F.3d 768, 773 (6th Cir. 1997) (citing *Dunn*, 480 U.S. at 302 and *United States v. Reilly*, 76 F.3d 1271, 1277-78 (2d Cir. 1996)).  The fact that the fence was only partially built – *i.e.*, that the pickets had not yet been inserted between the vertical posts – at the time of the search does not fully negate the significance of its presence.  The significance of this factor is not that the enclosure prevents others from seeing the area enclosed (that issue is addressed by the fourth *Dunn* factor).  Rather, the significance of the enclosure factor – as with all four of the *Dunn* factors – goes to the reasonableness of the defendant's expectation of privacy in the area in question.  The fence in this case clearly delineates the bounds of Defendants' property and separates the backyard from the two adjoining properties and the open field behind the property.  *See Jenkins*, 124 F.3d at 773 ("No one could mistake the yard, and its neatly mowed lawn and garden arrangements, for the unkept open fields composing the remaining portion of defendants' rural property.").  In fact, there is nothing in the yard *other* than the fence that evinces an intent to create a boundary, discourage physical intrusion, and maintain privacy.  The fence – even unfinished – is a clearly marked expression of the owner's claim to *private* property, with attendant expectations of privacy.

The Magistrate Judge concluded that the two cars separated the curtilage of the home from the open field, finding that the five to ten yards between the vehicles and the rear fence was an open field. However, the cars do not "clearly mark" a boundary around the house or a boundary line in the backyard. The cars were not situated in a manner indicating an intent to create such a boundary. They were parked to the *side* of the rear of the backyard, facing the front of the property. Moreover, the grass surrounding and underneath the vehicles was not overgrown – a fact from which one could reasonably infer that the cars had not been parked in that location long or indefinitely.

As the Supreme Court has held, "'for most homes, the boundaries of the curtilage will be clearly marked; and the conception defining the curtilage – as the area around the home to which the activity of home life extends – is a familiar one easily understood from our daily experience.'" *Dunn*, 480 U.S. at 302 (quoting *Oliver*, 466 U.S. at 182 n.12). The only boundaries clearly marked in this case were the boundaries established by the partially constructed wooden fence around a small residential lot. As discussed above, the two cars, located toward the rear and to the side of the property, do not separate one portion of the grass from any other. Nor does the large patch of grass separate the curtilage of the home from the back portion of the yard. To hold otherwise – especially when the grass runs right up against the house – would be "tantamount to finding that *no* portion of [Defendants'] property is curtilage." *Seidel*, 794 F. Supp. at 1103.

**3.     Nature of the Uses to Which the Area is Put**

11

The Magistrate Judge also found that there is little or no evidence that the area in which the plants were found harbored the "intimate activity" that is closely associated with the "sanctity of a man's home and the privacies of life." *Dunn*, 480 U.S. at 300. It is true that there were no children's toys, barbecue equipment, or clothes drying in the area where the plants were found. The presence of such objects may indicate that the area was used for intimate activity; however, neither the Government nor the Magistrate Judge cites any case law equating "intimate activity" with any *particular* domestic product or activity. Indeed, a lawn need not be riddled with children's toys to serve as a play area for children.[4]

The fact that the entire yard was maintained and the lawn mowed (even under the cars) is significant, first because it indicates some form of use, and second, because it is evidence of a very common, if not universal, domestic chore. And, although the barbecue grill was next to the house and not out in the middle of the lawn or by the cars, its presence in the yard indicates that at least some portion of the yard was used for cooking and/or cookouts – an intimate family activity.

Furthermore, the backyard is not large, and given the rear portion's close proximity to the residence, it is even more conceivable that the entire yard was used for family purposes. *See Jenkins*, 124 F.3d at 772-73 (noting that the small size of the defendant's backyard supported a finding that the area in question was within the curtilage of the defendant's home). One is not required to keep particular domestic objects on one's lawn

---

[4] There is no evidence that Defendants had children.

in order to maintain a reasonable expectation of privacy. If the presence of such objects is the only indication of "intimate use," then *no* portion of Defendants' backyard – other than a couple feet beyond the house – would meet this standard.

Nor was the rear area of the backyard "unoccupied or undeveloped." *Oliver*, 466 U.S. at 180 n.11. There is no evidence that the back portion of the property was neglected. Nor is there evidence that it was used for commercial purposes. *See Seidel*, 794 F. Supp. at 1104 (noting that commercial use "is not generally considered 'among those intimate activities associated with domestic life and the privacies of the home.'" (quoting *Dunn*, 480 U.S. at 301 n.4)). Storage – by use of the shed – is certainly an aspect of domestic life, as is building a fence around one's property.

Because Defendants' backyard was relatively small and uniformly maintained, and because there is evidence of intimate use and no evidence of commercial use, this factor weighs in favor of finding that the back portion of the backyard was within the curtilage of Defendants' home.

**4.      Steps Taken to Protect the Area from Observation**

The marijuana plants were located in the backyard, not the front yard. Courts have routinely distinguished the two, finding that there is little expectation of privacy in the activities conducted in one's front yard. The backyard was surrounded by two residential lots and an unoccupied field/forest in a rural area; thus, it was not visible to the everyday passerby. Further, although the privacy fence was not completed at the time of the search, Defendants had taken substantial steps to create the barrier.

Notably, however, the partially constructed wooden fence enclosing the backyard did not obstruct the view of the rear portion of the backyard. Thus, the marijuana plants could have been seen from the open field beyond the property, from the backyards of the adjoining properties, or from the air. Indeed, just because Defendants' backyard is within the curtilage of their house does not mean that "it receives protection from all police observation." *Jenkins*, 124 F.3d at 773. While this factor weighs against Defendants, the court finds that it does not, alone, tilt the balance against finding that the area in question was part of the curtilage of Defendants' home.

Though the yard was visible from beyond the fence, it is important to distinguish the physical invasion into defendants' backyard that took place in this case from "visual inspection from a lawful vantage point." *Jenkins*, 124 F.3d at 773. In *Florida v. Riley*, the Supreme Court, in a plurality opinion, distinguished physical invasion from lawful observation. 488 U.S. 445, 449-50 (1989). There, the Court held that curtilage is "not necessarily protected from inspection that involves no physical invasion." *Id.* at 449. "As a general proposition, the police may see what may be seen 'from a public vantage point where [they have] a right to be.'" *Id.* (quoting *California v. Ciraolo*, 476 U.S. 207, 213 (1986)). "Thus the police, like the public, would have been free to inspect the backyard" from a lawful vantage point "if their view had been unobstructed." *Id.* at 449-50.

This did not happen in the instant case, however. Upon receiving the "tip" that marijuana was growing behind Defendants' house,[5] the deputies did not seek a warrant; instead, they chose to visit Defendants' property immediately. After knocking on Defendants' front door and receiving no response, the deputies did not wait for Defendants' return and obtain consent to search the backyard.[6] Nor did the deputies drive the short distance to the vacant field behind Defendants' house or ask Defendants' neighbors for consent to use their backyards as a vantage point. Instead, the deputies chose to take a shortcut and physically intrude onto Defendants' private property and, ultimately, search their backyard.

In sum, the court finds that Defendants' entire backyard came within the curtilage of Defendants' home and thus garners the same Fourth Amendment protection that the home itself receives. Because it is undisputed that the Government did not possess a warrant to search the backyard and that no exceptions to the warrant requirement existed, the search of Defendants' backyard violated their Fourth Amendment rights. When the deputies stepped

---

[5] Deputy Thompson testified that he and Deputy Maggard received "a call that there were some marijuana plants *behind [Defendants'] house*." (Hr'g Tr. 6 (Doc. 36) (emphasis added).) Investigator Smithee testified that he "had overheard a call on the radio from dispatch . . . that possibly some marijuana plants were being grown *in a backyard* behind [Defendants'] address." (Hr'g Tr. 45 (Doc. # 36) (emphasis added).) The contradiction weighs against fully crediting testimony relating to the subjective intent of the deputies as they stepped toward the rear of the property. However, their state of mind is irrelevant to the question of curtilage. *See infra* note 6.

[6] It may be significant that the deputies knocked on Defendants' front door before walking through Defendants' backyard for another reason – for the act of seeking consent beforehand (if that was the reason for the knock) demonstrates the deputies' perceptions regarding the reasonableness (or unreasonableness, as the case may be) of the back-yard intrusion. *See Dunn*, 480 U.S. 294, 305 (Scalia, J., concurring) ("The officers' perceptions might be relevant to whether intrusion upon curtilage was nevertheless reasonable . . . ."). The latter thought is subsumed (and conclusively resolved) by the absence of any showing of an exception to the warrant requirement.

into Defendants' backyard – the curtilage of Defendants' home – they effectively stepped into the Defendants' home itself. *Oliver*, 466 U.S. at 180 ("[C]urtilage . . . has been considered part of the home itself for Fourth Amendment purposes"); *see also Dunn*, 480 U.S. at 300 (holding that curtilage "harbors the intimate activity associated with the sanctity of a man's home" (internal quotations omitted)).

### III.  CONCLUSION

Because the search of Defendants' backyard violated Defendants' Fourth Amendment rights, the evidence (as the Government concedes) obtained as a result of that illegal search – including the evidence obtained pursuant to the search warrant issued on the basis of the discovery of the marijuana plants – is due to be suppressed. *See Murray v. United States*, 487 U.S. 533, 536-37 (1988) ("The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search . . . . [and] also prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search . . . .").

Accordingly, it is ORDERED:

(1) Defendants' objections to the Magistrate Judge's Report and Recommendation (Docs. # 51, 52) are SUSTAINED; and

(2) Defendants' motions to suppress (Docs. # 27, 29) are GRANTED.

DONE this 29th day of July, 2010.

                                              /s/ W.  Keith Watkins
                                       UNITED STATES DISTRICT JUDGE

17